## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**UNITED STATES OF AMERICA**

**V.**                                             **CRIMINAL NO: 3:23cr39-CWR-LGI**

**WILLIAM ROBERT SHEPHERD, III**

### MOTION TO DISMISS INDICTMENT

Defendant William Robert Shepherd, III hereby files this Motion to Dismiss the Indictment, which charges him with one count of receiving and possessing a short-barreled shotgun that was not registered to him under the National Firearms Act, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871. Mr. Shepherd contends that the registration requirement for his firearm is unconstitutional, both on its face and as applied, in light of the United States Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), and the Fifth Circuit's guidance in *United States v. Rahimi*, 59 F.4th 163 (5th Cir. 2023) and *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023).

First, Mr. Shepherd contends that the registration requirement is unconstitutional with respect to short-barreled firearms because they are entitled to Second Amendment protection, and there are no historical analogues that would support registration. Second, Mr. Shepherd argues that, even if registration of his firearm is supported by historical analogues, there are no historical analogues that

1

would justify a complete and permanent deprivation of Mr. Shepherd's Second Amendment rights based on his failure to register the firearm. In support of this Motion, Mr. Shepherd presents the following argument:

## I.     Background information

### A.     Factual background

A park ranger stopped Mr. Shepherd as he drove on the Natchez Trace Parkway because his Honda Accord bore a business decal and because he was hauling a wheelbarrow and other personal items. That traffic stop evolved into a search of Mr. Shepherd's vehicle, at which time the park ranger discovered a short-barreled shotgun.

The National Firearms Act, passed in 1934, requires certain categories of firearms and other weapons, including short-barreled shotguns, to be registered with the federal government on the National Firearms Registration and Transfer Record. *See* 26 U.S.C. § 5841 *et seq.* Short-barreled shotguns and short-barreled rifles are not prohibited weapons, so long as they are properly registered. *See* 26 U.S.C. § 5845 (defining the criteria for registerable shotguns and rifles). Registration requires prompt filing of a number of forms and payment of a $200 stamp tax. *See* 26 U.S.C. §§ 5811, 5841. Violation of the National Firearms Act is a felony and carries a penalty of up to ten years' imprisonment. *See* 28 U.S.C. § 5871.

As a result of that search, Mr. Shepherd was indicted on one count of receiving and possessing a short-barreled shotgun that was not registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. §§ 5841, 5861(d) and 5871.

**B.      History of the National Firearms Acts' registration requirement**

The National Firearms Act ("NFA") was enacted in 1934, but legislative debate began a decade before the NFA became law. *See* Stephen P. Halbrook, *Congress Interprets the Second Amendment: Declarations by a Co-Equal Branch on the Individual Right to Keep and Bear Arms*, 62 Tenn. L. Rev. 597, 602, n. 30 (1995). In December 1924, Representatives debated prohibiting the sale, via U.S. Mail, of "pistols, revolvers, and other firearms capable of being concealed on the person." 66 CONG. REC. 725 (1924). Notably, Congress considered pistols and revolvers – handguns – to be dangerous weapons because they were often used in criminal activity. As the Congressional Record reflects, "[e]very robber, every highwayman, every highjacker, every bootlegger in the country is armed with a pistol" that could easily be concealed or discarded during a law enforcement pursuit and "replenish[ed]" by mail. *Id.* at 726. Pistols were also considered "the pet" firearm of criminals because "[i]t is an especially designed weapon with which to take human life. It is not like the shotgun, the rifle, or any firearm used in hunting or by the sportsman. Its very purpose is to kill people." *Id.* at 727.

3

The House of Representatives held another debate on gun control in 1930 after Prohibition led to increases in crime and a fear of Communism gripped the nation. Halbrook, 62 Tenn. L. Rev. at 602-03. The firearms at issue in the 1930 debate were pistols, revolvers, and machine guns, but at least one lawmaker noted that handguns were now considered self-defense weapons. *See id.* at 603.

In 1934, Congress finally succeeded in passing gun control legislation with the NFA. Congress recognized that it could not ban categories of firearms under the Second Amendment, but it could, under the interstate commerce clause, regulate them. Halbrook, 62 Tenn. L. Rev. at 606-11. The original bill would have required registration of pistols and revolvers, but subsequent drafts removed them from the registration requirement. *Id.* at 605.

The final bill required a hefty $200[1] stamp tax and registration of "machine guns, short-barreled shotguns, short-barreled rifles, and other selected firearms. *Id.* at 605-06. Penalties for failure to register covered firearms and pay the stamp tax included fines and a term of imprisonment up to five years. *See United States v. Miller*, 307 U.S. 174, n. 1 (1939). Passing the NFA under the Internal Revenue Code, however, meant that these penalties were not intended to have "other law

---

[1] One news article from 2016 notes that the NFA was passed during the Depression, when $200 would have been a significant amount of money. *See* https://www.npr.org/2016/06/30/484215890/prohibition-era-gang-violence-spurred-congress-to-pass-first-gun-law (last visited October 4, 2023).

enforcement purposes or to be a criminal penal code as such." Halbrook, 62 Tenn. L. Rev. at 612. Indeed, when Congress passed the Federal Firearms Act of 1938, the ban on felons in possession was limited to crimes of violence and did not include regulatory felonies like the criminal penalties of the NFA. *See* 52 Stat. 1250. Regulatory felonies – like the failure to register a firearm – did not implicate Second Amendment rights until 1968, when Congress passed the Gun Control Act. *See* PL 90-618, 82 Stat. 1213.

In 1939, two defendants (former bank robbers) challenged the constitutionality of the NFA after they were charged with transporting a short-barreled shotgun across state lines without having previously registered the firearm under the NFA. *Miller*, 307 U.S. at 176-78. The Supreme Court analyzed the NFA in the context of the history of militia service, noting that short-barreled shotguns could not be said to be "part of the ordinary military equipment" that civil soldiers were expected to provide as part of their conscription into the militia. *Miller*, 307 U.S. at 178-82. Accordingly, the Supreme Court upheld the NFA's registration requirement, holding that

> [i]n the absence of any evidence tending to show that possession or use of a [short-barreled shotgun] at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument.

*Id.* at 178.

5

*Miller* was considered a landmark case, and for approximately seventy years, it was "the only Supreme Court opinion construing the Second Amendment." Brian L. Frye, *The Peculiar Story of United States v. Miller*, 3 NYU J. L. & Liberty 48, 49 (2008). Frye notes in his essay, however, that courts "struggle[d]" to interpret *Miller* and that scholars "largely ignored *Miller*" because the Supreme Court's opinion was "an impenetrable mess." *Id.* Those who did wrestle with the opinion reached opposite conclusions about whether *Miller* holds that the Second Amendment is an individual right or a collective one. Frye concludes that *Miller* is a "surprisingly narrow decision," holding only that Congress may "tax firearms used by criminals." *Id.* at 50. Frye concludes that *Miller* is "largely irrelevant to the contemporary debate over the meaning of the Second Amendment." Frye, 3 NYU J. L. & Liberty at 50. Frye's conclusion was prescient, as *Dist. of Columbia v. Heller*, 554 U.S. 570, 592 (2008) was decided the same year he published his essay. That essay is cited in the Court's opinion.

## C.    Relevant case law developments regarding the National Firearms Act

In *Heller*, the Supreme Court interpreted *Miller* to hold that Second Amendment protection "extends only to certain types of weapons."[2] *Heller*, 554 U.S.

---

[2] *Heller* does say, in *dicta*, that "[w]e therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller*, 554 U.S. at 625. The Court's *dicta*, however, is not binding. As set forth below, short-

at 623. The Court found that *Miller* "did not even purport to be a thorough examination of the Second Amendment," and so had limited importance in determining the scope of the Second Amendment. *Id.* The Court then set up the proper framework for evaluating whether a particular weapon falls within the Second Amendment's scope of protection.

First, "the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. Second, "bearable arms" include firearms "in common use at the time" a challenge is considered. *Id.* This limitation, the Court held, "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627.

The Supreme Court has determined that the phrase "dangerous and unusual" is a conjunctive test – a weapon must be both dangerous *and* unusual. *See Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring). The Court has not defined dangerousness, but the *Caetano* concurrence notes that dangerousness requires something more than lethality. *See id.* Otherwise, "virtually every covered arm would qualify as 'dangerous.'" *Id.*

---

barreled shotguns are now weapons in common use and, therefore, fall under the protection of the Second Amendment.

The term "unusual" is clearly defined. If a weapon is currently in common use, it is not unusual. *See Caetano*, 577 U.S. at 412, 419-420 (2016) (second pinpoint citation Alito, J., concurring). The Court later drew on this framework when it decided *Bruen. See Bruen*, 142 S. Ct. at 2128, 2143.

## II. Legal Standards

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const., amend. II. The Supreme Court has held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592.

The Supreme Court's recent decision in *Bruen* set out "the standard for applying the Second Amendment":

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 142 S. Ct. at 2129–30. In so holding, the Supreme Court rejected lower courts' use of means-end scrutiny in Second Amendment cases. *See id.* at 2125–27 & n.4 (abrogating *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185 (5th Cir. 2012)). "To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this

Nation's historical tradition of firearm regulation." *Bruen,* 142 S. Ct. at 2126. In other words, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

*Bruen* provides that when a court is required to analyze the "Nation's historic tradition of firearm regulation," two standards apply. *Bruen*, 142 S. Ct. at 2130-31. In some cases, the historical inquiry is "fairly straightforward." *Id.* at 2131. "For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131 (emphasis added). Where a challenged regulation addresses "unprecedented societal concerns or dramatic technological changes," courts need only find a "relevantly similar" regulation to justify a restriction on Second Amendment rights. *Id.* at 2132. In evaluating whether a historical regulation is distinctly or relevantly similar to the modern regulation being challenged, courts should look to "two metrics," addressed in *Heller* and *McDonald*: "*how* and *why* the regulations burden" Second Amendment rights. *Bruen*, 142 S. Ct. at 2132-33 (emphasis added). Additionally, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are *central*

considerations when engaging in an analogical inquiry." *Id.* at 2133 (internal punctuation and citations omitted) (emphasis in original).

The historical tradition test, then, requires more than a broad declaration that relies on generalities. The Supreme Court, in *Bruen*, engaged in a detailed analysis of statutes and regulations, giving priority to those in existence at the time the Second Amendment was ratified. *See id.* at 2136. The Court did so because, "when it comes to interpreting the Constitution, not all history is created equal." *Id.* at 2136. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634-35. Accordingly, courts must "guard against giving postenactment history more weight than it can rightly bear." *Id.* Historical evidence from the late nineteenth century and the twentieth century "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154 & n.28; *see also Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2267 (2022) (stating that "how the States regulated" when a constitutional Amendment was ratified is "the most important historical fact").

The Fifth Circuit has provided additional guidance for lower courts to utilize in analyzing the constitutionality of a statute under the *Bruen* framework. *Rahimi* holds that *Bruen* "'fundamentally change[d]' our analysis of laws that implicate the Second Amendment, [] rendering out prior precedent obsolete." *Rahimi*, 59 F.4th at

170. Courts in the Fifth Circuit, then, should follow *Rahimi*'s example of careful, in-depth analysis of potential historical analogues, giving greater weight to those analogues closest in time to the Second Amendment's ratification. *See id.* at 174-79. This analysis requires this Court to analyze both "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133 (quoted in *Rahimi*, 59 F.4th at 179).

The Fifth Circuit recently confirmed this approach to *Bruen* in *Daniels*, stating that courts must "hew closely to *Bruen*'s own reasoning and hold the government to its heavy burden." 77 F.4th at 342. In *Daniels*, the Court explained that the Bruen historical analysis "requires both close attention to history and analogical reasoning." 77 F.4th at 341. To find a "tradition" of restricting Second Amendment rights, the government must present evidence of "well-accepted limits" that "share a common 'why' and 'how'" with the current restriction – "they must both address a comparable problem (the 'why') and place a comparable burden on the rightsholder (the 'how')." *Id.* at 342. In other words, "[w]hat matters is whether a conceptual fit exists between the old law and the new." *Id.*

## III.  Argument

The Second Amendment's plain text covers the conduct proscribed by 26 U.S.C. §§ 5841, 5861(d) and 5871, and the prosecution cannot meet its burden to establish (1) that the registration requirement for a short-barreled shotgun is

consistent with the Nation's historical tradition of firearm regulation; or (2) that the Nation's historical tradition of firearm regulation supports the complete and permanent loss of Second Amendment rights based solely on the failure to register a firearm. Therefore, 26 U.S.C. §§ 5841, 5861(d), and 5871 are unconstitutional, both facially and as applied to Mr. Shepherd.

## A.    The Second Amendment generally protects firearm possession.

Applying *Bruen*'s standard, the Second Amendment's plain text covers the receipt and possession of a firearm. The term "'[k]eep arms' was simply a common way of referring to possessing arms." *Heller*, 554 U.S. at 583. Accordingly, Mr. Shepherd's conduct – possession of a firearm – is presumptively protected.

## B.    The Second Amendment protects short-barreled firearms because they are "bearable arms."

The definition of "bearable arms" is not set in stone, and as explained above, *Miller* is not dispositive. The Supreme Court has been clear: the Second Amendment, like other constitutional rights belonging to "the people," encompasses modern technology. *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627, 629 for the proposition that "Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in common use for self-defense today. They are, in fact, 'the quintessential self-defense weapon.'").

Even if short-barreled shotguns and firearms were considered unusual at the time Congress passed the NFA, that designation no longer holds true. Short-barreled firearms are now popular firearms in common use; therefore, they fall under the scope of the Second Amendment's protections

**1. "Bearable arms" are weapons "in common use."**

*Heller* defines a "bearable arm" as one that "is in common use at the time," "possessed at home," and for "lawful purposes like self-defense." *Heller*, 554 U.S. at 582, 627; *see also Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016) (quoting these portions of *Heller* in evaluating whether a machine gun is a "bearable arm"). The Supreme Court has not set forth a bright line test, but in *Caetano*, 577 U.S. at 412, the Court held a lower court erred in finding that a stun gun was not a "bearable arm."

In a concurring opinion, Justice Alito, joined by Justice Thomas, explained in greater detail why a stun gun was "in common use" and was not a "dangerous *and* unusual weapon." *Caetano*, 577 U.S. at 416-20. The concurrence rejected the lower court's finding that because stun guns were less popular than handguns, they were not "in common use" or were "unusual." To the contrary, Justice Alito wrote that "[t]he more relevant statistic is that 'hundreds of thousands of Tasers and stun guns have been sold to private citizens,' who it appears may lawfully possess them in 45 States." *Id.* at 420 (citing a statistic that 200,000 civilians owned stun guns in 2009).

13

The concurrence found that 200,000 stun guns qualified as "widely owned" and that stun guns were accepted as a legitimate means of self-defense across the country." *Caetano*, 577 U.S. at 420.

### 2. Short-barreled firearms are "bearable arms."

By the Supreme Court's own standards, short-barreled shotguns and rifles are now considered weapons in common use, and *Miller*'s analysis, which did not follow the current test for "bearable arms," is not dispositive. The evidence of ownership of short-barreled firearms demonstrates that these weapons have become widely owned and are used for lawful purposes.

The federal Bureau of Alcohol, Tobacco, and Firearms ("ATF") is responsible for maintaining the National Firearms Registration and Transfer Record, the NFA firearms registry whose requirements Mr. Shepherd is charged with violating. The earliest available online report related to the registry is from 2011. It states that, as of December 2010, there were 191,191 short-barreled firearms (shotguns and rifles) on the registry. *See* https://tinyurl.com/2011NFA at 24 (last visited October 5, 2023). This number of firearms is just shy of the 200,000 number that the *Caetano* concurrence found sufficient to meet the definition of a "bearable arm." *Caetano,* 577 U.S. at 420.

In contrast, the most recent report states that, as of May 2021, there were 512,315 short-barreled firearms (shotguns and rifles) on the registry. *See*

https://tinyurl.com/2021NFA at 15-16 (last visited October 5, 2023). Again, while short-barreled firearms are not as popular as handguns, the number of registered weapons demonstrates that short-barreled firearms are in common use.

Thanks to new regulations, however, the number of registerable short-barreled firearms now reaches into the millions. In January 2023, the Attorney General signed ATF Rule 2021R-08F, codified at 27 C.F.R. § 479.11. That regulation provides as follows: equipping a handgun with a "stabilizing brace" that "allows the weapon to be fired from the shoulder" converts the weapon from a handgun to a short-barreled rifle that must be registered under the NFA. *See* https://tinyurl.com/2023NFAReg (last visited October 4, 2023). The ATF reported in its impact assessment that there were between 3,000,000 and 7,000,000 pistol braces in existence. *See* https://tinyurl.com/ATFimpact2023 at 18 (last visited October 5, 2023). The Congressional Research Service reported that the estimated number of pistol braces was likely between 10 and 40 million. *See* https://tinyurl.com/CRSestimate (last visited October 5, 2023). The Congressional Research Service explained that "some firearms enthusiasts view [Gun Control Act]-regulated handguns and pistol grip firearms equipped with stabilizing braces as viable alternatives to the more strictly NFA-regulated short-barreled rifles and shotguns." *See id.* In other words, short-barreled firearms that can be fired from the shoulder are extremely popular among

gun owners, whether those firearms originated as shotguns and rifles or whether they are retrofitted handguns.

The regulation has been the subject of multiple legal challenges in federal court, including in the Fifth Circuit. In *Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023), a panel held that the ATF's process in promulgating the pistol brace rule likely violated the Administrative Procedures Act and remanded the case to the lower court to enter a preliminary injunction, giving the lower court authority to determine the remaining findings and scope of relief. Notably, the panel declined to enter a nationwide injunction. *See id.* at 587. On remand, the lower court entered that injunction. *See Mock v. Garland*, Case No. 4:23-cv-95-O, 2023 WL 6457920 (W.D. Tex., Oct. 2, 2023). Whether the regulation stands or falls, however, the fact remains that short-barreled firearms – be they manufactured or altered to meet the definition in the NFA – are weapons in common use.

Because short-barreled firearms are weapons in common use, they are subject to Second Amendment protection. Accordingly, Mr. Shepherd's possession of a short-barreled shotgun is conduct protected by the Second Amendment.

**C.    Mr. Shepherd is one of "the people" protected by the Second Amendment.**

Mr. Shepherd is also one of "the people" protected under the Second Amendment's plain text. Both *Heller* and *Bruen* begin their analysis with the presumption that "the people" means all people under the protective umbrella of the

16

Constitution. *See Heller*, 554 U.S. at 580-81; *Bruen*, 142 S. Ct. at 2126, 2156. *Heller* holds that when the Constitution references the rights of "'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580-81 This means that there is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans" *Id.* Likewise, *Bruen* reiterates that the Second Amendment guarantees to "all Americans" the right to keep and bear arms. *Bruen*, 142 S. Ct. at 2156 (quoting *Heller*, 554 U.S. at 581).

The Supreme Court has adopted this reasoning because the phrase "the people" is a term of art found in the First, Second, Fourth, Ninth, and Tenth Amendments to the Constitution that applies broadly. S*ee Heller*, 554 U.S. at 579-80; *see also* U.S. CONST., amend. I (using "the people" in Assembly-and-Petition Clause); U.S. CONST., amend. IV (using "the people" in Search-and-Seizure Clause); amend. IX (providing that enumerated rights in the Constitution do not diminish "others retained by the people"); amend X (reserving all other powers not delegated to "the States respectively, or to the people.").

The Fifth Circuit has also adopted this reading of *Bruen* and *Heller*. *See Rahimi*, 59 F.4th at 171. As the Fifth Circuit explained in *Rahimi*, to limit "the people" protected by the Second Amendment's guarantee of the individual right to bear arms is to "turn[] the typical way of conceptualizing constitutional rights on its

head" and would allow Congress to "remove 'unordinary' or 'irresponsible' or ' non-law abiding people' – however expediently defined – from the scope of the Second Amendment." *Rahimi*, 59 F.4th at 453. Being law-abiding is not a prerequisite to claiming the protection of the Second Amendment. To find that the Second Amendment applies only to "law-abiding citizens" would set it apart from the other individual rights set forth in the Bill of Rights and relegate it to the "second-class" status that the Supreme Court decried as unconstitutional. *Bruen*, 142 S. Ct. at 2156 (citing *McDonald*, 561 U.S. at 780 (plurality opinion)).

Mr. Shepherd has some minor criminal history, but he is not prohibited from possessing a firearm. Accordingly, Mr. Shepherd is presumptively entitled to protection under the Second Amendment.

**D.    The government cannot establish the existence of historical analogues supporting the registration of firearms.**

Whether the court opts to utilize the "distinctly similar" or "relevantly similar" standard, the registration of short-barreled firearms is unconstitutional on its face and as applied to Mr. Shepherd because there is no history, either at the Founding or when the Fourteenth Amendment was adopted, of registering firearms in the United States.

Counsel for Mr. Shepherd has searched the Repository of Historical Gun Laws housed on the Duke Center for Firearms Law website and found no relevant registration requirements. A pre-*Bruen* article on that same website addresses this

question and found that "long gun" (i.e., shotguns and rifles) registration requirements did not exist until the 1890s and were uncommon. *See* https://firearmslaw.duke.edu/2019/07/the-historical-pedigree-of-long-gun-registration/ (last visited October 5, 2023). The NFA was the first legislation in the United States to broadly require the registration of any firearm. Under *Bruen*, the NFA is not consistent with the Nation's historical tradition of firearm regulation.

**E.      The government cannot establish the existence of historical analogues supporting the complete and permanent deprivation of Second Amendment rights for failure to register a firearm.**

Because there is no historical tradition of regulating firearms, there is also no historical tradition of completely and permanently stripping Second Amendment rights away from people who fail to register those firearms. For cases under the NFA, the penalty amounts to a total deprivation of Second Amendment rights.

Even if this Court were to find that the NFA, passed in 1934, meets the historical tradition test, by its own terms, it was never intended to permanently deprive violators of their Second Amendment rights. The NFA is not a criminal statute. It is a tax statute that carries felony criminal penalties.

When the NFA was passed in 1934, there was no prohibition on felons possessing firearms. The Federal Firearms Act of 1938 imposed a felon-in-possession ban only for those convicted of certain crimes of violence. *See* 52 Stat. 1250. The NFA's criminal penalties did not implicate the Second Amendment until

the Gun Control Act of 1968 imposed the felon-in-possession ban on *all* felons. *See* PL 90-618, 82 Stat. 1213.

This 20th century history is insufficient to establish historical analogues that would justify permanently depriving Mr. Shepherd of his Second Amendment rights based on his failure to register a firearm.

## IV.  Conclusion

Mr. Shepherd's possession of a short-barreled shotgun is presumptively protected by the Constitution. The government cannot meet its burden to establish a historical tradition of requiring persons who possess short-barreled firearms to register those firearms, nor can it meet its burden to establish a historical tradition of stripping Second Amendment rights from people who fail to register a firearm.

WHEREFORE, Mr. Shepherd respectfully requests that this Court grant his

Motion to Dismiss Indictment.

Respectfully submitted, this the 12th day of October, 2023.

**WILLIAM ROBERT SHEPHERD, III**
**Defendant**

by:      s/ *Michael L. Scott*
         **Michael L. Scott** (MB # 101320)
         Senior Litigator
         Office of the Federal Public Defender
         S. District of Mississippi
         200 S. Lamar St., Suite 200 North
         Jackson, Mississippi 39201
         Telephone: (601)948-4284
         Facsimile: (601)948-5510
         Email:  mike_scott@fd.org

         Attorney for Defendant

## **CERTIFICATE OF SERVICE**

I, Michael L. Scott, certify that on October 12, 2023, this Motion was filed with the Clerk of the United States District Court for the Southern District of Mississippi, using the electronic case filing system, which in turn sent an electronic copy of this Motion to all attorneys of record in this case.

s/ *Michael L. Scott*
Attorney for Defendant