IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**UNITED STATES OF AMERICA**

**V.**                                             **CRIMINAL NO: 3:23cr39-CWR-LGI**

**WILLIAM ROBERT SHEPHERD, III**

**REPLY TO MOTION TO DISMISS INDICTMENT**

The Government has failed to meet its burden. First, the Government does not address the substance of Mr. Shepherd's argument on the initial question: whether short-barreled firearms are subject to Second Amendment protection. Second, the Government's proffered historical analogues fail the *Bruen* test because they are neither distinctly nor relevantly similar to the restrictions and consequences imposed by the registration requirement of the National Firearms Act. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2132-33 (2022).

**A.    Short-barreled firearms are weapons in common use and are protected by the Second Amendment.**

A "bearable arm" is one that "is in common use at the time," "possessed at home," and for "lawful purposes like self-defense." *Dist. of Columbia v. Heller*, 554 U.S. 570, 582, 627 (2008). Short-barreled firearms meet all the requirements for the definition of a "bearable arm," as set forth in Mr. Shepherd's motion. Specifically, Mr. Shepherd established that the number of registered short-barreled firearms

1

exceeds the threshold for "common use" and that the Government's own statistics indicate that the number of short-barreled firearms actually numbers in the millions and are popular among gun owners for self-defense. *See* https://tinyurl.com/2021NFA at 15-16 (last visited October 5, 2023); https://tinyurl.com/ATFimpact2023 at 18 (last visited October 5, 2023).

The Supreme Court has re-affirmed as recently as 2016 that the substantive test must be applied. *See Caetano v. Massachusetts*, 577 U.S. 411 (2016). Rather than arguing that short-barreled firearms do not meet the substantive test for a "bearable arm," however, the Government instead relies on outdated judicial findings and *dicta*. The Government's reliance on *United States v. Miller*, 307 U.S. 174 (1939) and *Heller*'s *dicta* cannot carry the question in the face of overwhelming objective evidence that short-barreled firearms, whatever their status in 1939 (*Miller*) and 2008 (*Heller*), are now bearable arms.

Likewise, the Government's conclusory reasoning that the legislative reasoning behind the 1934 National Firearms Act (NFA) resolves the question today is without merit. *See* Gov. Br., ECF 29 at 8 (stating that the NFA establishes a clear "congressional intent to cover under the [NFA] only such modern and lethal weapons, except pistols and revolvers, as could be used readily and efficiently by criminals or gangsters"). As Mr. Shepherd set forth in his motion, even at the time Congress passed the NFA in 1934, it considered handguns – not short-barreled

2

firearms – to be "the pet" weapon of choice for criminals. Def. Br., ECF 28 at 3-4. Congress understood, however, that it could not include handguns in the registration without violating the Second Amendment because handguns were also widely considered to be weapons of self-defense. Def. Br., ECF 28 at 3-4. By Congress's own rationale, short-barreled firearms would not be included in the NFA today because they now stand alongside handguns as a weapon of self-defense.

For these reasons, the Government has failed to establish that Mr. Shepherd's conduct in this case – possession of a short-barreled shotgun – falls outside the scope of the Second Amendment's protection. Mr. Shepherd's conduct is presumptively constitutional.

**B.     The Government's historical analogues do not establish that the NFA is consistent with the Nation's historical tradition of regulating firearms.**

The Government first contends that it need not present any analogues because the NFA's registration requirement is an administrative scheme that imposes a reasonable burden on the Second Amendment, one akin to requiring potential firearms owners to undergo fingerprinting or a background check. Gov. Br., ECF 29 at 9. As Mr. Shepherd pointed out in his motion, in 1934, when Congress passed the NFA, that may well have been true. Def. Br., ECF 28 at 19-20. As of 1968, however, conviction under the NFA constitutes a complete and permanent deprivation of Second Amendment rights. The Government fails to address that argument in its response.

Second, the Government's proffered historical analogues fail because they do not meet *Bruen*'s metrics for evaluating the similarity between historical analogues and the challenged statute: "how and why" a statute burdens the Second Amendment. *Bruen*, 142 S.Ct. 2132-33. The Government presents two types of statutes that it contends satisfy the *Bruen* test, but neither example is comparable to the NFA's registration requirement.

> **1. The historical analogues related to registration and taxation are neither distinctly nor relevantly similar to the NFA.**

In its first proffered analogue, the Government argues that "colonial governments substantially controlled the firearms trade" and relies on four statutes derived from a law review article. Gov. Br., ECF 29 at 10 (citing *Teixera v. Cnty of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017); Robert J. Spitzer, Gun Law History in the United States and Second Amendment Rights, 880 Law & Contemp. Probs. 55, 76 (2017).

The first statute, from New York in 1652, regulated trade of guns, gun powder, and lead. Notably, the Duke Center for Firearms Law, which houses a comprehensive repository of historical gun laws, notes that "the exact text has been lost to history." *See* https://tinyurl.com/1652NYGunLaw (last visited October 20, 2023). Accordingly, the Government cannot demonstrate how or why this historical statute impacted Second Amendment rights.

The second statute, from 1631 Virginia, required plantation owners to make a yearly account not just of "armes and munitions," but also of the enslaved people on their property and "corne, cattle, hoggs, goates, barques, boates, gardens, and orchards." https://archive.org/details/statutesatlargeb01virg/page/174/mode/2up at 174-75 (last visited October 20, 2023). Plantation owners in violation of the statute were to be "censured by the Governor and Counsell." This accounting statute was a broad property registration requirement, making it questionable as a Second Amendment analogue. More importantly, the statute carried no criminal penalty, not even forfeiture of the arms in question. As such, this Virginia statute fails the *Bruen* test.

The third and fourth statutes, from 17th century Connecticut and Virginia, limited the sale of firearms and ammunition to residents of the colony. Although the Government places great emphasis on the phrase "inside the colony" in the Virginia statute, the Government gives no context for these statutes. Scholars opine, however, that the Virginia statute was passed following Bacon's Rebellion[1], a year-long fight by Nathaniel Bacon to enslave Indians, acquire Indian land, and promote anti-Indian sentiment. Nicholas J. Johnson, et al, *Firearms Law and the Second Amendment: Regulation, Rights, and Policy*, 197 (3d ed. 2012). Similarly, the Connecticut statute was passed to prohibit sales to Indians. *See* Johnson, supra, at 211-12, n. 81; The

---

[1] *See* https://tinyurl.com/VABaconsRebellion (last visited October 20, 2023).

Public Records of the Colony of Connecticut, https://tinyurl.com/CTfirearmsales (last visited October 20, 2023). These statutes, then, are more akin to those historical analogues intended to restrict dangerous persons from owning firearms – not to prevent "unusual" weapons from circulating. Notably, violations of these statutes did not result in complete and permanent disarmament.

### 2. The historical analogues promoting firearm safety regulations are neither distinctly nor relevantly similar to the NFA.

The Government's second historical analogue relates to safety regulations. The Government readily admits that these statutes are not identical, but it argues that these safety-related statutes are evidence that the legislature can regulate firearms generally "to ensure that they can be traced (e.g., when they are believed to have been used in a crime)." Gov. Br., ECF 29 at 11.

In support of this theory, the Government cites an 1814 Massachusetts statute that required all newly manufactured guns to be tested before entering the stream of commerce. Gov. Br., ECF 29 at 10. The purpose of that statute was to ensure that the firearms produced could fire without exploding. Spitzer, *supra*, at 74. The Government also cites an 1820 New Hampshire statute that appointed state gunpowder inspectors. Gov. Br., ECF 29 at 10; Spitzer, *supra*, at 74.

These historical analogues also fail to pass the *Bruen* test for multiple reasons. First, they bear no relation at all to the NFA, which does not purport to be a safety regulation. The NFA is a tax scheme with criminal penalties.

Second, these safety statutes impose no criminal sanctions. The Government cites no enforcement mechanisms in these statutes, and because they are general administrative law statutes imposed on commercial manufacturers and gunpowder repositories, any sanctions for violating the safety regulations would not infringe upon an individual's Second Amendment rights. In contrast, the NFA is designed to impact individual gun owners' rights. Violation results in permanent deprivation of Second Amendment rights.

Third, even if the Court found these safety regulations relevant to the *Bruen* analysis, these statutes were passed in the 19th century and are removed from the Founding, when the Second Amendment was ratified. Therefore, they must be viewed as less persuasive. *See Bruen*, 142 S.Ct. at 2154 (citing *Heller*, 554 U.S. at 614).

**C.   Conclusion**

The Government has presented no historical analogues that would support registration of bearable arms, such as Mr. Shepherd's short-barreled shotgun. More importantly, the Government can show no evidence that any historical administrative regulation of firearms carried the type of penalties associated with the NFA. In short, the NFA burdens Second Amendment rights in ways that this Nation's historical tradition never contemplated.

WHEREFORE, Mr. Shepherd respectfully requests that this Court grant his Motion to Dismiss Indictment.

Respectfully submitted, this the 23rd day of October, 2023.

**WILLIAM ROBERT SHEPHERD, III**
**Defendant**

by:   s/ *Michael L. Scott*
**Michael L. Scott** (MB # 101320)
Senior Litigator
Office of the Federal Public Defender
S. District of Mississippi
200 S. Lamar St., Suite 200 North
Jackson, Mississippi 39201
Telephone: (601)948-4284
Facsimile: (601)948-5510
Email:  mike_scott@fd.org

Attorney for Defendant

## **CERTIFICATE OF SERVICE**

I, Michael L. Scott, certify that on October 23, 2023, this Motion was filed with the Clerk of the United States District Court for the Southern District of Mississippi, using the electronic case filing system, which in turn sent an electronic copy of this Motion to all attorneys of record in this case.

s/ *Michael L. Scott*
Attorney for Defendant
